**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

**KINDRED HOSPITALS EAST, LLC,**
**d/b/a Kindred Hospital – Bay Area –**
**St. Petersburg,**

                                              **Plaintiff,**

**v.**
                                                                              **17-CV-851V(Sr)**

**BUFFALO BOARD OF EDUCATION,**
**BUFFALO BOARD OF EDUCATION**
**EMPLOYEE BENEFIT PLAN, and**
**HEALTHNOW NEW YORK, INC.**
**d/b/a BlueCross BlueShield of**
**Western New York,**

                                              **Defendants.**

---

## REPORT, RECOMMENDATION, AND ORDER

          Plaintiff Kindred Hospitals East, LLC ("Kindred") commenced this action

against defendants Buffalo Board of Education ("the Board"), Buffalo Board of

Education Employee Benefit Plan ("the Plan") (collectively "the Plan Defendants"), and

HealthNow New York, Inc. ("HealthNow"), the Plan administrator, alleging breach of

contract based on the defendants' refusal to pay for medical treatment that Kindred

provided to a patient, since deceased, who was an Insured under the Plan.  Dkt No. 73.

This case was referred to the undersigned by the Hon. Lawrence J. Vilardo, pursuant to

28 U.S.C. § 636(b)(1), for all pretrial matters and to hear and report upon dispositive

motions.  Dkt. No. 71.  Currently before the Court is Defendant HealthNow's Motion to

Dismiss the First Amended Complaint (Dkt. No. 76) as well as the Plan Defendants'

Motion to Dismiss the First Amended Complaint (Dkt. No. 77).  For the following

reasons, it is recommended that HealthNow's Motion (Dkt. No. 76) be GRANTED, and

that the Plan Defendant's Motion (Dkt. No. 77) be GRANTED in part and DENIED in part.

## BACKGROUND

The following facts, which are presumed true for the purposes of defendants' motions to dismiss, are taken from the First Amended Complaint. Dkt. No. 73. On September 2015, Kindred Hospital, a long term acute care ("LTAC") hospital in St. Petersburg, Florida admitted a patient ("the Insured"), a retired Buffalo, New York school teacher, who was referred from local hospital, Lakeland Regional Hospital ("Lakeland"). Dkt. No. 73, ¶¶ 4, 10, 36. Lakeland doctors had performed a tracheotomy on the Insured after she was admitted for respiratory distress, sepsis with hypotension, and lower left leg amputation due to gangrene. Dkt. No. 73, ¶¶ 10, 11. Lakeland referred the Insured to Kindred for ventilator weaning, wound care, and monitoring for infection and other comorbidities. Dkt. No. 73, ¶ 11.

Because the Insured was not alert or oriented upon admission to Kindred and was unable to follow commands or speak, the Insured's daughter, who was also the Insured's Power of Attorney and, upon information and belief, her sole heir, signed Kindred's Hospital Admission Agreement, which contained a "detailed assignment of benefits provision." Dkt. No. 73, ¶¶ 12, 13, 15. The provision "assigned all rights, title and interest in any and all health or medical benefits or payments due to the Insured under any insurance plan or policy to Kindred Hospital, expressly including the right to sue to enforce payment, the right to sue for denial of coverage, and the right to appeal a denial of payment with any insurer, employer group or other payer." Dkt. No. 73, ¶ 14.

Prior to the Insured's admission, Kindred was aware, based on insurance information provided by Lakeland, that Medicare Part A was the primary payer for the Insured's medical costs.  Dkt. No. 73.  Medicare Part A pays for 90 days of hospital benefits within a "benefit period," as that term is defined by law, and 60 "life-time reserve days" that can be used at any time.  Dkt. No. 73, ¶ 16.  According to Medicare's Common Working File, the Insured had 137 Part A hospital days left.  Dkt. No. 73, ¶¶ 16, 17.  The Insured also had Medicare Part B coverage, which generally covers out-patient physician visits but "will pay for certain lab tests and a few ancillary items while a patient remains in a hospital setting."  Dkt. No. 73, ¶¶ 17.

Medicare's Common Working File for the Insured revealed that she also had secondary coverage through defendant HealthNow, the claims administrator for the defendant Plan.  Dkt. No. 73, ¶¶ 7, 18.  Generally, secondary carriers cover costs that Medicare does not pay, like Medicare coinsurance, and "further provide[ ] primary coverage to an insured after the insured's Part A hospital benefits exhaust."  Dkt. No. 73, ¶ 18.  As part of its "verification process,"[1] Phyllis Bowden, an employee of Kindred, contacted HealthNow to confirm that coverage existed and the terms of payment.  Dkt. No. 73, ¶ 19.  A HealthNow employee named Angela advised Ms. Bowden that "coverage existed [for the Insured]; that it was effective as of January 1, 2015; that it was a Traditional Blue self-funded ASO plan; that there were no out-of-pocket costs and no deductible; that Kindred was in-network; that Kindred Hospital would be paid at 100 percent of its contract rate with the local BlueCross affiliate (Blue Cross Blue Shield of

---

[1]  It is not clear from the Amended Complaint whether this verification process occurred prior to the Insured's admission, contemporaneous to it, or shortly thereafter.  Dkt. No. 73, ¶¶ 10-22.

Florida, referred to as 'BCBSFL') after Medicare Part A hospital benefits exhausted; and that no precertification was required."  Dkt. No. 73, ¶ 20.  To further verify, Kindred "pulled an eligibility screen from the BCBSFL website," which confirmed the same basic information regarding the insured's secondary coverage that the HealthNow representative, Angela, had reported over the phone.  Dkt. No. 73, ¶ 21.

Approximately four months later, shortly before the Insured's Medicare Part A hospital benefits were to exhaust, Kindred contacted HealthNow to once again confirm coverage.  Dkt. No. 73, ¶ 23.  At this juncture, a different HealthNow representative characterized the plan as an "indemnity plan" and advised that Kindred would be paid at "Medicare DRG rates" after Medicare Part A hospital benefits were exhausted, a lower rate than what was initially represented.  Dkt. No. 73, ¶ 23. HealthNow also advised, contrary to what Angela had represented prior, that precertification was required before the Insured's Medicare Part A hospital benefits exhausted.  Dkt. No. 73, ¶ 24.  Accordingly, Kindred "immediately provided clinical information to HealthNow and requested precertification."  Dkt. No. 73, ¶ 24.

Kindred "was confused by the abrupt change in position, which was contradicted by HealthNow's earlier representations" and the fact that HealthNow had paid Kindred some of the Insured's Part A co-insurance costs, "and believed the HealthNow representative who . . . conveyed the information was mistaken."  Dkt. No. 73, ¶ 27.  Accordingly, Kindred endeavored to speak with someone at a "higher level" within HealthNow for "clarification" of the coverage issue.  Dkt. No. 73, ¶ 27.  On February 17, 2016, a HealthNow representative named Melanie advised Kindred that

the Plan did cover hospital expenses but did not provide "long term care hospital benefits." Dkt. No. 73, ¶ 28. Shortly thereafter, the Insured's daughter contacted HealthNow to inquire about the latest information reported to Kindred, and was told that "long term care" was not covered under the Plan. Dkt. No. 73, ¶ 29, 76.

Notwithstanding these representations, HealthNow made another payment to Kindred, approximately $8,505.00, towards the Insured's Part A coinsurance. Dkt. No. 73, ¶ 30. In Kindred's view, HealthNow's payment "did not make sense if, as HealthNow belatedly stated, there was no coverage for LTAC care under the [Plan]." Dkt. No. 73, ¶ 30.

Kindred notified the Insured's daughter that she would be personally responsible for her mother's medical expenses if HealthNow did not pay after Medicare Part A exhausted on January 16, 2016. Dkt. No. 73, ¶¶ 31, 32. The Insured's daughter in turn retained counsel ("Insured's counsel") who in March 2016, advised Kindred that "the charges were properly covered by HealthNow" and inquired whether Kindred had formally submitted any post-exhaust claims to HealthNow. Dkt. No. 73, ¶ 31. At that juncture, Kindred had not done so because the hospital was required to first bill Medicare Part A for an exhaust remittance advice ("RA") to show the secondary carrier that Medicare Part A benefits had exhausted. Dkt. No. 73, ¶ 32. Because Medicare Part A only permits billing in 60-day intervals, Kindred could not bill Medicaid Part A for post-exhaust services to acquire the requisite RA until March 16, 2016. Dkt. No. 73, ¶ 32.

After Medicare Part A exhausted, Kindred also billed Medicare Part B on a monthly basis.  Dkt. No. 73, ¶ 33.  Once paid by Medicaid Part B, the Insured's claims would automatically "cross-over" to HealthNow as the secondary carrier for payment of the Part B coinsurance.  Dkt. No. 73, ¶ 33.  Generally, Kindred would include the Medicaid Part B RAs in its post-exhaust claims, so the secondary payer could deduct the Part B payments from its post-exhaust payments.  Dkt. No. 73, ¶ 32.  At this point, Medicare had not provided Kindred with the Part B RAs typically included with the post-exhaust Part A billing to secondary carriers.  Dkt. No. 73, ¶ 33.  However, upon the request of the Insured's counsel, Kindred billed its first 60-day post-exhaust claim to HealthNow on March 19, 2016, "intending to forward the Medicare exhaust RA and the Part B RAs separately upon receipt."  Dkt. No. 73, ¶ 34.

On March 22, 2016, Kindred learned that the Insured had been a Buffalo Public School teacher and pulled the Summary Plan Description ("SPD") effective January 1, 2015 from the Buffaloschools.org website.  Dkt. No. 73, ¶ 37.  The SPD set forth the following regarding the claim submission and appeal process:

**What Is A Claim for Benefits?**

**Pre-Service Claims:**
Pre-service claims are claims for which advance approval is required. Pre-service claims may be submitted by telephone or in writing.

. . . .

**Post-Service Claims:**
A post-service claim is defined as any request for Plan benefits that complies with the Plan's procedure for making a claim for benefits. A participating *health care provider* will submit a claim directly to the Plan on your behalf. If you desire Plan benefits, you must submit a claim when services are rendered by a *health care provider* that does not participate in the network.

. . . .

**When A Claim for Benefits Should be Filed**

**Pre-Service Claim:**
When precertification of a claim is required, you should follow the procedures outlined in the Medical Management Program article of this Plan.

If you desire a predetermination of plan benefits, you should notify *the claims processor* at least 15 calendar days prior to receiving services.

**Post-Service Claims:**
A claim for benefits must be filed within ***12 months of the date of service*** . . . . .

**Notice To Claimant Of Adverse Benefit Determination**
The Plan Administrator shall provide written or electronic notice of any adverse benefit determination. The notice will state the following:

The specific reason(s) for the adverse determination.

Reference to the specific Plan provisions on which the determination was based.

A description of any additional information necessary for the claimant to perfect the claim for benefits, and an explanation of why such material or information is necessary.

A description of the Plan's appeal procedures, including a statement of the claimant's right to bring a civil action under section 502 of ERISA

. . . . .

**Pre-Service and Post-Service Claim Appeal**
You may appeal an adverse benefit determination. When a claimant receives an adverse benefit determination for a claim, the claimant has ***180 days following receipt of the notification to appeal the decision***. Otherwise, the initial adverse benefit determination shall be the final decision of the Plan.

When a claimant receives an adverse benefit determination for a pre-service claim, a grievance can be filed with the claims processor orally or in writing. A grievance for a post-service claim must be submitted in writing.

This Plan provides for two levels of internal appeals. If the adverse benefit determination is partially or fully upheld, a claimant may appeal the initial appeal decision. The decision of the Plan upon the second internal appeal shall be considered the final decision of the Plan . . . .

**No action at law or in equity can be brought to recover under this Plan after the expiration of three years after the claim has been filed with the Plan Administrator.**

Dkt. No. 73-1, pp. 52-57 (emphasis added).

The SPD also contained two definitions of "hospital" that in its view, Kindred clearly met.  Dkt. No. 73, ¶ 40.  Accordingly, on March 24, 2016, Kindred sent HealthNow a detailed letter, 50 pages with exhibits including relevant portions of the SPD describing the Insured's care, the Centers for Medicare and Medicaid Services' explanation of "Long Term Acute Care hospitals," "a Medicare print-out affirming that Medicare Part A covers care at LTACs as hospital care, . . . Kindred Hospital's accreditation as a hospital by the Joint Commission on Accreditation of Health Care Organizations, Kindred Hospital's hospital license, and the front page of its hospital contract with BCBSFL."  Dkt. No. 73, ¶ 42.  Kindred argued to HealthNow that "the Plan expressly covered services rendered by a hospital as that term was defined by the Plan[,]" and that Kindred was "entitled to payment for both the outstanding Medicare Part A and Part B coinsurance and compensation at the rate in its contract with BCBSFL for the post-exhaust care and treatment."  Dkt. No. 73, ¶ 42.

Kindred thereafter received an Explanation of Benefits, dated April 4, 2016 from BCBSFL, indicating no payment on the first post-exhaust claim stating, "[c]laim denied because services are not covered under the member's benefit plan." Dkt. No. 73, ¶ 43. Kindred construed this correspondence as the first "Notice to Claimant of Adverse Benefit Determination" under the Plan that it had received regarding the Insured's care. Dkt. No. 73, ¶ 43. However, the Explanation of Benefits did not contain certain information required under the SPD to be stated in such a Notice, such as the SPD provision upon which the determination was based, a description of additional information necessary for claimant to perfect the claim, and a description of the appeal procedures. Dkt. No. 73, ¶ 44; Dkt. No. 73-1, p. 54.

Notwithstanding the denial of post-exhaustion benefits, HealthNow continued to pay for Medicare Part B coinsurance as late as March 13, 2017, "although it inconsistently and curiously also recouped some portions of the Part A coinsurance." Dkt. No. 73, ¶ 45.

Kindred continued to provide "medically necessary" care to the Insured as "no skilled nursing facility in Florida was able to provide the Insured with the intensity of services she required," such as ventilator care, tracheotomy suctioning and management, hemodialysis, IV antibiotics, and intensive wound care. Dkt. No. 73, ¶ 46. Due to the Insured's comorbidities, it was not possible to discharge her safely. Dkt. No. 73, ¶ 46.

Between April 29, 2016 and July 7, 2016, Kindred was engaged in discussions with Patricia Bonvissuto, an attorney representing HealthNow, culminating in a July 7, 2017 call during which she challenged the JCAHO accreditation Kindred provided previously. Dkt. No. 73, ¶¶ 47-54. It was Kindred's understanding that "HealthNow was holding to the position of exclusion although it has not yet talked to the Plan." Dkt. No. 73, ¶ 53. Later that day, Kindred provided a second JCAHO accreditation letter to Ms. Bonvissuto to rebut HealthNow's position. Dkt. No. 73, ¶ 54.

Given Kindred's understanding that the Plan had not reviewed the Insured's claim, it sent out a "Notice of Intention to File a Claim to the Attorney General of the State of New York," dated July 13, 2016, copying the benefits manager for the Plan, Ms. Bonvissuto, and the Insured's counsel. Dkt. No. 73, ¶ 55. Neither the Plan nor HealthNow responded to the Notice. Dkt. No. 73, ¶ 56. The Insured passed away on October 16, 2016, such that Kindred's claim amounts became fixed. Dkt. No. 73, ¶ 58. On November 3, 2016, Kindred sent another "Notice of Intention to File a Claim" to Edward Betz, General Counsel of the Board, and the Board generally, but once again, got no response. Dkt. No. 73, ¶ 58.

Kindred sent its final claims for the Insured's post-exhaust care and treatment to HealthNow in January of 2017, and received a final denial from BCBSFL on February 21, 2017. Dkt. No. 73, ¶ 60. The final denial was ambiguous "insofar as it stated it was pending further disposition pending review of Medicare EOB, and further contained statements asserting that certain codes reflected non-covered charges and that allowed amounts were based on agreement." Dkt. No. 73, ¶ 61. Kindred received

its final Part B coinsurance payment from HealthNow on March 13, 2017.  Dkt. No. 73, ¶ 61.

Plaintiff commenced this action in the Circuit Court of the Sixth Judicial Circuit in and for Pinellas County, Florida, serving Defendants on April 11, 2017.  Dkt. No. 1-1.    On May 10, 2017, the Defendants removed the matter to the United States District Court of the Middle District of Florida, Tampa Division.  Dkt. No. 1.  The Defendants then moved to dismiss the complaint or in the alternative, to transfer venue to the Western District of New York.  Dkt. No. 6.  On August 23, 2017, United States District Judge Susan C. Bucklew granted the motion "to the extent that Defendants seek transfer," transferred the case to the Western District of New York, Buffalo," and otherwise denied the motion.  Dkt. No. 39, p. 11.  Defendants again moved to dismiss the complaint for failure to state a claim, and the case was eventually referred to the undersigned.  Dkt. Nos. 52, 53, 71.

This Court granted Plaintiff leave to file an Amended Complaint on December 27, 2017, and found as moot the Defendants' pending motions to dismiss. Dkt. No. 72.  On January 2, 2018, Plaintiff filed an Amended Complaint alleging four claims: against the Plan Defendants for breach of the Plan (Count I) and for a declaration of rights (Count IV), and against all defendants for breach of oral contract (Count II) and breach of implied-in-fact contract (Count III).  The Plan Defendants and HealthNow thereafter moved to dismiss the Amended Complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  Dkt. Nos. 76, 77.

## DISCUSSION AND ANALYSIS

**Dismissal Standard**

To survive a motion to dismiss pursuant to Rule 12(b)(6) of the Federal

Rules of Civil Procedure, "a complaint must contain sufficient factual matter, accepted

as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570

(2007)). "A claim has facial plausibility when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged." *Iqbal*, 556 U.S. at 678. Application of this standard is "a context-

specific task that requires the reviewing court to draw on its judicial experience and

common sense." *Id.* 556 U.S. at 679.

In adjudicating a Rule 12(b)(6) motion, a district court must confine its

consideration "to facts stated on the face of the complaint or incorporated in the

complaint by reference, and to matters of which judicial notice may be taken." *Leonard*

*F. v. Israel Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999); *see also Kramer v. Time*

*Warner, Inc.*, 937 F.2d 767, 773 (2d Cir. 1991).

**Choice of Law**

A federal court exercising diversity jurisdiction must apply the choice of

law analysis of the forum state to determine which state's substantive law to

apply. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496-97 (1941); *Gilbert v.*

*Seton Hall Univ.,* 332 F.3d 105, 109 (2d Cir. 2003). In New York, the forum state in this

case, "the first question to resolve in determining whether to undertake a choice of law

analysis is whether there is an actual conflict" between the laws of the jurisdictions involved. *Fieger v. Pitney Bowes Credit Corp.*, 251 F.3d 386, 393 (2d Cir. 2001); *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of New Jersey, Inc.*, 448 F.3d 573, 582-83 (2d Cir. 2006); *In re Allstate Ins. Co. (Stolarz),* 81 N.Y.2d 219, 223 (1993). "It is only when it can be said that there is no actual conflict that New York will dispense with a choice of law analysis." *Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir. 1998).

Kindred does not dispute that New York law governs Counts I and IV relating to breach of the written SPD. However, it argues that Florida law, rather than New York law applies to Counts II and III asserting breach of oral contract and breach of implied contract. Dkt. No. 82, pp. 13-14. HealthNow argues that no actual conflict exists between New York law and Florida law on the requirement to plead consideration to state a claim for breach of contract, a critical issue upon which its motion to dismiss relies.

**Breach of Oral Contract (Count II)**

<u>*New York Law*</u>

To prevail on a claim for breach of contract under New York law, a plaintiff must prove: (1) a contract; (2) performance of the contract by plaintiff; (3) breach by the other party; and (4) damages. *Terwilliger v. Terwilliger,* 206 F.3d 240, 245-46 (2d Cir. 2000). To establish the existence of a contract under New York law, a plaintiff must allege an offer, acceptance, consideration, mutual assent, and intent to be bound. *Rozsa v. May Davis Group, Inc.* 152 F. Supp. 2d 526, 533 (S.D.N.Y. 2001); 22 N.Y. Jur. 2d, Contracts § 9 (West 2018). The plaintiff must also establish that there was a

13

meeting of the minds, demonstrating the parties' mutual assent and mutual intent to be bound. *Oscar Productions, Inc. v. Zacharius,* 893 F. Supp. 250, 255 n. 3 (S.D.N.Y. 1995) (citation omitted); *see also May v. Wilcox,* 182 A.D.2d 939, 940 (3rd Dep't 1992) (reasoning that "to create a binding contract there must be a meeting of the minds as to the essential terms of the agreement"); 22 N.Y. Jur. 2d, Contracts § 18 (West 2018) (recognizing that the "very essence of a contract is definiteness as to material matters").

Where an alleged contract is oral, plaintiff has a particularly heavy burden to establish objective signs of the parties' intent to be bound. *Oscar Productions,* 893 F. Supp. at 255 (citing *Winston v. Mediafare Entm't Corp.,* 777 F.2d 78, 80 (2d Cir.1985)). "The burden is heavier in oral agreements because '[a] primary concern for courts in such disputes is to avoid trapping parties in surprise contractual obligations that they never intended.'" *Id.* (quoting *Arcadian Phosphates, Inc. v. Arcadian Corp.,* 884 F.2d 69, 72 (2d Cir.1989)). "More is needed than agreement on each detail to create a binding obligation; [Rather, t]here must be overall agreement . . . to enter into the binding contract." *Id.*

Florida Law

Under Florida law, "[t]o establish a breach of contract, a party must show the existence of a contract, a breach thereof, and damages." *Miller v. Nifakos,* 655 So. 2d 192, 193 (Fla. 4th DCA 1995) (per curiam). "To prove the existence of a contract, a plaintiff must plead: (1) offer; (2) acceptance; (3) consideration; and (4) sufficient specification of the essential terms." *Taste Trackers, Inc. v. UTI Transp. Sols., Inc.*, No. 13-23377-CIV, 2014 WL 129309, at *3 (S.D. Fla. Jan. 14, 2014); *Uphoff v. Wachovia*

14

*Sec., LLC,* No. 09-80420-CIV, 2009 WL 5031345, at *2 (S.D.Fla. Dec. 15, 2009)

(citing *St. Joe Corp. v. McIver,* 875 So. 2d 375, 381 (Fla. 2004)).

Furthermore, "[t]o state a cause of action for breach of an oral contract, a plaintiff is required to allege facts that, if taken as true, demonstrate that the parties mutually assented to 'a certain and definite proposition' and left no essential terms open." *W.R. Townsend Contracting, Inc. v. Jensen Civil Constr., Inc.,* 728 So. 2d 297, 299 (Fla.Dist.Ct.App. 1999); *see also Jacksonville Port Authority v. W.R. Johnson Enterprises, Inc.,* 624 So. 2d 313, 315 (Fla. 1st DCA 1993) (holding that "so long as any essential matters remain open for further consideration, there is no completed contract") (internal citations omitted).

## Implied in Fact Contract (Count III)

### New York Law

Under New York law, the conduct of the parties may lead to the inference of a binding agreement:

> A contract implied in fact may result as an inference from the facts and circumstances of the case, although not formally stated in words, and is derived from the presumed intention of the parties as indicated by their conduct. It is just as binding as an express contract arising from declared intention, since in the law there is no distinction between agreements made by words and those made by conduct.

*Jemzura v. Jemzura,* 36 N.Y.2d 496, 503-04 (N.Y. 1975) (internal citations omitted);

*Beth Israel Med. Ctr.*, 448 F.3d at 582.

While the means by which such an agreement is proven may differ, "[t]he elements of an implied-in-fact contract are the same as the elements of an express contract: consideration, mutual assent, legal capacity and legal subject matter." *Lapine v. Seinfeld*, 31 Misc. 3d 736, 740 (N.Y. Sup. Ct. 2011) (quoting *Maas v. Cornell Univ.,* 94 N.Y.2d 87, 93-94 (1999)).  A contract will not be found to have been formed under settled New York law if it is "not reasonably certain in its material terms." *Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp.,* 74 N.Y.2d 475, 482 (1989); *Edelman v. Poster,* 72 A.D.3d 182, 184 (1st Dep't 2010).

Florida Law

Under Florida law, an implied contract "is based on a tacit promise, one that is inferred in whole or in part from the parties' conduct, not solely from their words." *Stout v. Med-Trans Corp.*, 313 F. Supp. 3d 1289, 1297 (N.D. Fla. 2018) (quoting *Ship Constr. & Funding Servs. (U.S.A.), Inc. v. Star Cruises, PLC*, 135 F. App'x 218, 220 (11th Cir. 2005)); *Commerce P'ship v. Equity Contracting Co., Inc.*, 695 So. 2d 383, 385-86 (Fla. 4th DCA 1997)).  To state a cause of action for breach of implied contract, a plaintiff must still allege facts that establish the existence of a contract, a material breach, and resulting damages. *Friedman v. N.Y. Life Ins. Co.,* 985 So. 2d 56, 58 (Fla. 4th DCA 2008).  A resulting contract based on the parties' alleged words is characterized as express, whereas, a contract based on the parties' conduct is said to be implied in fact. *Id.*

Contracts implied in fact always "rest on the assent of the parties." *Commerce P'ship, Inc.*, 695 So. 2d at 386. "The only distinction between an express and implied-in-fact contract is the manner in which the parties' assent is manifested or proven." *Baron v. Osman*, 39 So. 3d 449, 451 (Fla. Dist. Ct. App. 2010). Implied-in-fact contracts commonly arise "where one person performs services for another at his request, or where services are rendered by one person for another without his expressed request, but with his knowledge, and under circumstances which give rise to the presumption of a promise to pay for them," and "reasonable compensation may be recovered." *Lewis v. Meginniss*, 12 So. 19, 21 (Fla. 1892); *Gem Broad., Inc. v. Minker*, 763 So. 2d 1149, 1151 (Fla. 4th DCA 2000). While the law will not recognize an implied-in-fact contract where an express contract exists, a contract may be inferred where an express contract fails for lack of proof. *See Quayside Assocs., Ltd. v. Triefler,* 506 So. 2d 6, 7 (Fla. 3d DCA 1987).

Having reviewed the substantive law of both New York and Florida relating to oral and implied contracts, this Court finds that no actual conflict exists between the jurisdictions. Kindred is not, as it argues, absolved under Florida law of its obligation to plead consideration in its claims for breach of oral and implied contract. Dkt. No. 82, pp. 13-14. In the absence of an actual conflict, this Court will apply New York law to all of the claims raised herein. *See Excess Ins. Co. Ltd. v. Factory Mut. Ins. Co.,* 2 A.D.3d 150, 151 (1st Dep't 2003), *aff'd,* 3 N.Y.3d 577 (N.Y. 2004) (holding that "[i]f no conflict exists, then the court should apply the law of the forum state in which the action is being heard"); *Wechsler v. Four Seasons Hotels Ltd.*, No. 13 CIV. 8971 RJS, 2014 WL 2604109, at *3 (S.D.N.Y. June 10, 2014)

**Notice of Claim Requirements**

The Plan Defendants argue that Kindred's claims against the Board must be dismissed because it failed to file a timely notice of claim or file suit within the one-year statute of limitations as required by New York Education Law § 3813.  "The purpose of Section 3813 of the Education law is to give a school district prompt notice of claims 'so that investigation may be made before it is too late for investigation to be efficient.'" *Clark By & Through Clark v. Grp. Plan for Employees of N. Tonawanda Pub. Sch.*, 845 F. Supp. 117, 122 (W.D.N.Y. 1994) (quoting *Matter of Board of Education, Union Free School District # 7, Town of North Hempstead,* 7 N.Y.2d 476, 483 (1960)). However, parties to a contract may waive compliance with N.Y. Education Law § 3813, by either "affirmatively agree[ing] that the statutory notice clause be inapplicable, or, at least, [by] set[ting] out detailed procedures which are 'plainly inconsistent with those contained in that section.'"  *Matter of Geneseo Central School,* 53 N.Y.2d 306, 311 (1981) (quoting *Matter of Guilderland Central School District,* 45 A.D.2d 85, 86 (3rd Dep't 1974)).

There is no question that the SPD governing the Insured's medical benefits sets forth procedures that are plainly inconsistent with N.Y. Education Law § 3813.  For example, it mandates that a claim for benefits be filed within 12 months of the date of service, allows a claimant 180 days following receipt of an adverse benefit determination to appeal the decision, and sets forth a three year period – measured from the date the claim was first filed – in which a claimant can file "an action at law or in equity."  Dkt. No. 73-1, pp. 53, 55, 59.  Under the circumstances, this Court finds that

it was clearly the intent of the Board and Plan not to follow the requirements and statutory limitations set forth in N.Y. Education Law § 3813.

The Plan Defendants argue that Kindred cannot avail itself of the SPD's contractual extension of the statute of limitations because Kindred is not the Plan beneficiary. However, the SPD clearly contemplates that parties other than the beneficiary, such as health care providers, would be using its claims and appeals process. As an initial matter, the term "claimant" is not defined by the SPD. Dkt. No. 73-1. Notably, the SPD mandates that certain post-service claims be submitted by a participating health care provider, rather than the beneficiary, directly to the Plan. Dkt. No. 73-1, p. 52. If a particular claim is denied, the "claimant" may then appeal within 180 days. Dkt. No. 73-1, p. 53. Finally, the SPD's provision that "[n]o action at law or in equity can be brought to recover under this Plan after the expiration of the three years after the claim has been filed with the Plan Administrator" is not limited by its plain language to beneficiaries. Resolving these ambiguities against the Plan as the drafter of the contract, *McCarthy v. Amer. Int'l Group, Inc.*, 283 F.3d 121, 124 (2d Cir. 2002), "claimant" could mean anyone who has a claim, including a health care provider like Kindred.

Moreover, Kindred has alleged that the Insured's daughter, who was her Power of Attorney, assigned Kindred her mother's rights under the SPD by executing an Admission Agreement on her behalf. As previously noted, this provision "assigned all rights, title and interest in any and all health or medical benefits or payments due to the Insured under any insurance plan or policy to Kindred Hospital, expressly including the

19

right to sue to enforce payment, the right to sue for denial of coverage, and the right to

appeal a denial of payment with any insurer, employer group or other payer."  Dkt.

No. 73, ¶ 14.  This assignment placed Kindred in the shoes of the Insured vis-à-vis the

Plan.  *U.S. Bank Nat. Ass'n v. Denisco*, 96 A.D.3d 1659, 1661 (4th Dep't 2012)

(recognizing that "it is well settled that "an assignee steps into the shoes of its assignor .

. . [and] may pursue the same remedies as would have been available to the assignor")

(internal citations and quotations omitted).

HealthNow challenges that the Insured's rights were validly assigned to

Kindred, citing to an affidavit filed in support of a prior motion, stating that the Insured's

daughter told a HealthNow representative that she did not, in fact, have power of

attorney for her mother.  Dkt. No. 6-1, p. 5.  "The court's function on a Rule 12(b)(6)

motion is not to weigh the evidence that might be presented at a trial but merely to

determine whether the complaint itself is legally sufficient."  *Holloway v. King*, 161 F.

App'x 122, 124 (2d Cir. 2005) (quoting *Goldman v. Belden,* 754 F.2d 1059, 1067 (2d

Cir. 1985)).  Kindred has alleged that the Insured's daughter was her power of attorney,

and that she executed a valid assignment of her mother's rights.  Dkt. No. 73, ¶¶ 12, 13.

Any contrary evidence outside of the Amended Complaint will not be considered in

resolving Defendants' motions to dismiss.

Based on the foregoing, this Court finds that the notice of claim

requirements and the statute of limitations period provided in N.Y. Education Law

§ 3813 do not apply to any claims arising from an alleged breach of the SPD.  The

alleged oral and implied contracts are most definitely distinct from the written contract

(the SPD) in that the former contracts are far more specific.  Nonetheless, all of the alleged contracts arise from the SPD.  In this Court's view, HealthNow, as the agent and claims administrator for the Plan, would never have made any specific representations regarding coverage or made payments toward(s) that coverage if the SPD did not exist.  Moreover, the SPD clearly contemplates that there would be no direct communication between itself (the Plan and/or the Board) and its insureds.  Rather, by the SPD's terms, all communication is between the "claimant" and the "Plan Administrator" (See, e.g., Dkt. No. 73-1, p. 57), in this case, HealthNow.  In this respect, all of Kindred's alleged contract claims (written, oral, and implied) arise from the SPD, which waived N.Y. Education Law's 90-day notice of claim requirements and extended the statute of limitations period to three years.

Given the facts alleged in the Amended Complaint, it cannot be said that Kindred failed to adhere to the SPD's 12-month claim filing deadline and three-year statute of limitation for filing suit, since Kindred commenced this action approximately 12 months after BCBSFL formally denied Kindred's first claim for post-exhaust care, and sent two "Notices of Intention to File a Claim" to representatives of the Board prior to filing suit.  *See* Dkt. No. 73, ¶¶ 43, 55, 58 (Amended Complaint alleging that Kindred received its first Explanation of Benefits from BCBSFL, dated April 4, 2016, stating "claim denied because services are not covered under the member's benefit plan," and sent "Notice of Intention to File Claim" dated July 13, 2016 and November 3, 2016 to the Board and/or its representatives) *and* Dkt. No. 1-1 (Initial Complaint filed in Sixth Judicial District In and For Pinellas County, Florida on April 11, 2017).  Therefore, it is RECOMMENDED that the Plan Defendant's motion to dismiss the breach of all the

contract claims on the basis that it did not adhere to the requirements of N.Y. Education Law § 3813, or that the claims were otherwise untimely, should be DENIED.

**Breach of Oral and Implied Contract**

As previously noted herein, to state a claim for breach of oral contract or breach of implied contract, a plaintiff must establish that a contract exists between the parties by alleging an offer, acceptance, consideration, mutual assent, and intent to be bound in the case of an oral contract, *Rosza*, 152 F. Supp. 2d at 533, or consideration, mutual assent, legal capacity, and legal subject matter for an implied-in-fact contract. *Lapine*, 31 Misc. 3d at 741.  The most meaningful difference between claims for breach of express written and oral contracts on one hand and those for breach of implied-in-fact contracts on the other is the means through which these contractual elements are ultimately proven.

HealthNow argues that the general information that its representative provided to Kindred during its initial verification call did not constitute an oral or implied contract because there was no mutual assent or consideration.  Dkt. No. 76-1, pp. 15-19.  The Plan Defendants argue that if the breach of oral contract and implied contract are dismissed against HealthNow, they must also be dismissed as to them.  Dkt. No. 77-1, p. 26.  Kindred argues that it has adequately pleaded both claims.  Dkt. No. 82, pp. 20-23.

"Consideration sufficient to create a contract 'consists of either a benefit to the promisor or a detriment to the promisee.'" *Vista Food Exch., Inc. v. BenefitMall*, 138 A.D.3d 535, 536 (1st Dep't 2016) (quoting *Weiner v McGraw-Hill, Inc.*, 57 N.Y.2d 458, 464 (1982)). "The valid consideration which will support a contract need not be equal on both sides . . . ." *Silver v. Starrett*, 176 Misc. 2d 511, 519 (N.Y. Sup. Ct. 1998), but a breach of contract claim cannot survive where a plaintiff fails to allege that "by making the purported oral promise, [the promisor] received any new consideration." *CDJ Builders Corp v. Hudson Group Construction Corp.*, 67 A.D.3d 720, 721 (2nd Dep't 2009).

Kindred contends that it has alleged consideration as follows: under the terms of the oral and implied-in-fact contract alleged by Kindred, "Kindred was to provide care and treatment to the Insured . . . in exchange for Defendant[s'] obligations to pay for that care and treatment." Dkt. No. 82, pp. 20-21. While this Court agrees that the *Plan Defendants* benefitted from Kindred's promise to provide medical care to the Insured, it does not agree that *HealthNow*, as the third-party administrator for the Plan, derived a benefit from that promise. Kindred alleges that "[h]ad Defendants denied services and payment for the care and treatment of the Insured when Kindred Hospital called to verify coverage, Defendants would have faced an angry plan member and her daughter, a potential lawsuit from the Plan member (whose daughter was a Florida lawyer), and even bad publicity stemming from their refusal to help a retired teacher covered by the Plan." Dkt. No. 73, ¶¶ 76, 83. Putting aside the speculative nature of this alleged detriment, it cannot be said that the threat of a lawsuit or bad publicity

23

supports Kindred's oral and implied contract claims against HealthNow.  As the third-party administrator for the Plan, HealthNow did not itself provide coverage, but rather acted only as an intermediary between the Plan (which arguably does have an obligation to pay for the Insured's medical care at Kindred) and the Insured.  In this regard, Kindred has failed to allege any benefit or detriment to HealthNow that constitutes consideration for the alleged oral or implied contracts.  Therefore, Counts II and III of the Amended Complaint should be dismissed as against HealthNow.

The Plan Defendants argue, without citing to any case law, that dismissing these claims against HealthNow compels dismissal of the counts against them as well. Dkt. No. 77-1, p. 26.  This Court does not agree.  The oral promises and implied promises made by HealthNow as the Plan Defendants' agent were much more specific than (and possibly contrary to) the Plan Defendants' general obligations under the SPD. The oral promise was that Kindred would be paid at 100 percent of its contract rate with BCBSFL after Medicare Part A hospital benefits were exhausted in exchange for Kindred providing medically necessary treatment to the Insured.  Dkt. No. 73, ¶ 20.  As previously noted, Kindred's promise was one from which the Plan Defendants, unlike HealthNow, derived a benefit.

The implied promise that the Plan would pay Kindred for the Insured's LTAC was implied from the Defendants' conduct in paying Kindred for her Part A co-insurance.  Dkt. No. 73, ¶ 30.  As Kindred alleged in its Amended Complaint, payment of the Insured's Part A coinsurance "did not make sense if . . . there was no coverage

for LTAC care under the [Plan]." Dkt. No. 73, ¶ 30. For purposes of this motion, this Court finds that Kindred has alleged sufficient facts to support a claim for breach of oral contract and breach of implied contract as against the Plan Defendants. Accordingly, it is RECOMMENDED that HealthNow's motion to dismiss Counts II and III be GRANTED, and the Plan Defendants' motion, to the extent that it seeks dismissal of these accounts, be DENIED.

**Whether the Plan Is A Separate Entity from the Board**

The Plan Defendants have not cited any legal authority for the proposition that the Plan is not a separate legal entity capable of being sued. Moreover, this Court declines to consider the declaration cited by the Plan Defendants regarding the Tax ID number as this evidence falls outside of the Amended Complaint. Given the procedural posture of the case, it is RECOMMENDED that the Plan Defendants' request to terminate the Plan as a party to this action be DENIED.

**Declaratory Judgment (Count IV)**

The Declaratory Judgment Act ("DJA") provides that "any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). "Courts have consistently interpreted this permissive language as a broad grant of discretion to district courts to refuse to exercise jurisdiction over a declaratory action that they would otherwise be empowered to hear." *Dow Jones & Co., Inc. v. Harrods Ltd.*, 346 F.3d 357, 359 (2d Cir. 2003). "Declaratory relief is appropriate where an actual controversy exists and a declaration would serve a useful purpose in clarifying

or settling the legal issues involved." *Am. Auto. Ins. Co. v. Advest, Inc.*, No. 08 CIV. 6488 (LAK), 2009 WL 3490060, at *1 (S.D.N.Y. Oct. 28, 2009) (internal quotation omitted).

"However, where a declaratory judgment claim is redundant of a primary claim raised by a party to a lawsuit, it is properly dismissed as duplicative," including "claims that simply mirror another party's claims." *Gorfinkel v. Ralf Vayntrub, Invar Consulting Ltd.*, No. 11-CV-5802, 2014 WL 4175914, at *6 (E.D.N.Y. Aug. 20, 2014); *see also Apple Records, Inc. v. Capitol Records, Inc.*, 137 A.D.2d 50, 54 (1st Dep't 1988) (holding that "[a] cause of action for a declaratory judgment is unnecessary and inappropriate when the plaintiff has an adequate, alternative remedy in another form of action, such as breach of contract"). Moreover, declaratory judgment is inappropriate where a party has already invoked its right to a coercive remedy. *See Am. Auto. Ins. Co.*, 2009 WL 3490060, at *1 (holding that "[w]here . . . the dispute may be resolved in a direct action for coercive relief, courts may dismiss the declaratory judgment complaint"). Given that Kindred has an adequate remedy in its breach of contract claims, this Court RECOMMENDS that the Plan Defendants' motion to dismiss Kindred's declaratory judgment claim (Count IV) be GRANTED.

## CONCLUSION

For the foregoing reasons, it is RECOMMENDED that defendant HealthNow's motion to dismiss the amended complaint (Dkt. No. 76) be GRANTED and that HealthNow be terminated as a party to this action.

It is further RECOMMENDED that the Plan Defendants' motion to dismiss the amended complaint (Dkt. No. 77) be GRANTED to the extent it seeks dismissal of Kindred's declaratory judgment claim (Count IV), and DENIED in all other respects.

Therefore, it is hereby **ORDERED** pursuant to 28 U.S.C. § 636(b)(1) that:

This Report, Recommendation, and Order be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report, Recommendation and Order must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statute, Fed.R.Civ.P. 72(b)(2) and Local Rule 72. **Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Judge's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 72 of the Local Rules for the Western District of New York, "written objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection, and shall be supported by legal authority." **Failure to comply with the provisions of Local Rule 72 may result in the District Judge's refusal to consider the objection.**

The district judge will ordinarily refuse to consider *de novo*, arguments, case law and/or evidentiary material which could have been, but were not presented to the magistrate judge in the first instance. *See, e.g., Paterson-Leitch Co., Inc. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988). In accordance with the requirements set forth in Local Rule 72, "[a]ny party filing objections to a Magistrate Judge's order or recommended disposition must include with the objections to the District Judge a written statement either certifying that the objections do not raise new legal/factual arguments or identifying the new arguments and explaining why they were not raised to the Magistrate Judge."

    **SO ORDERED.**

DATED:　　　Buffalo, New York
　　　　　　　October 2, 2018

                               ***s/ H. Kenneth Schroeder, Jr.***
                               **H. KENNETH SCHROEDER, JR.**
                               **United States Magistrate Judge**